The Attorney General ex rel. Saunders vs. The Albion Academy & Normal Institute and others.

*May 12 — June 4, 1881.*

Corporations: Mandamus. *When the Attorney General may bring the action.*

1. The defendant corporation, organized under an act of the legislature approved March 31, 1863, is a private stock corporation, and not an eleëmosynary or public corporation; under the provisions of its charter no one can claim the *right* to receive instruction in the institution on any terms, and no provision is made for gratuitous instruction; the only restrictions upon it are, that no religious tenets shall be required of any trustee or student, and "no sectarianism shall be taught or tolerated" in the institution, and that "persons of both sexes " shall be admitted to all its·advantages; and no violation of these provisions is alleged, but the only object of this proceeding is to determine who are entitled to vote at elections of trustees or at other corporate meetings of the stockholders. *Held*, that, on general principles of public law, the attorney general cannot bring the action, but the remedy is by private action of the parties aggrieved.

2. The defendant corporation is " an incorporated academy or select school " within the meaning of secs. 3237, 3239, R. S., and the right of the attorney general to intervene is excluded by that statute.

APPEAL from the Circuit Court for *Dane* County.

*Mandamus.* The relator and the individual defendants constitute the acting board of trustees of the defendant corporation. The complaint gives a history of that corporation, which was organized under chapter 342, P. & L. Laws of 1863 (supplement). It charges that certificates for a large number of shares of the capital stock of the corporation have been illegally issued to divers persons; that the holders of these certificates are permitted to vote thereon at elections of trustees; and that divers other persons, who have subscribed and paid large sums of money to said corporation, are denied the right to vote at such elections. The acts of the board of trustees, by which the above results were accomplished, are set out in the complaint, but it is not deemed necessary to recite them here. The object of the action is to have it judicially determined who are entitled to vote at elections of trustees or at corporate meetings of stockholders of the corporation. The prayer of the complaint is, that the voting list of the corporation be corrected; that certain by-laws, by means of which the wrongs complained of have been perpetrated, be adjudged void; and that the affairs of the corporation be placed in the hands and under the control of a proper board of trustees, to be appointed by the court, until a board is elected by the legal voters of the corporation. The answer of the defendants maintains that all of the acts of the board of trustees in the premises have been and are regular and legal.

The findings of the court (which seem to be supported by the evidence) contain all additional facts in the case necessary to be stated. They are as follows:

"In 1853, the legislature of this state passed an act entitled 'An act to incorporate the Albion Academy and Teachers' Seminary,' approved April 2, 1853. By said act certain persons therein named were created a body politic and corporate, by the name just stated, with power (among other powers) to acquire, purchase, receive, possess, hold and enjoy property,

real and personal, and to sell and convey the same, rent, or otherwise dispose of it at pleasure. It was also provided by said act, that the stock of said company should be divided into shares of $10 each, which should be deemed personal property, and should be transferable on the books of said corporation in such manner as should be directed by the by-laws; and that nine trustees should be elected by ballot, who were invested with certain general powers therein specified, to accomplish the object of said corporation, which was, in effect, to establish and maintain an educational institute of the grade of an academy or seminary. The said act was accepted by the persons named therein as corporators, who soon thereafter organized a corporation in pursuance thereof, received subscriptions to the capital stock in shares of $10 each, solicited and received gifts and donations, acquired lands in the village of Albion, Dane county, erected two large buildings, established a school of the grade of an academy or seminary, issued scholarships, and maintained said school.

" In the year 1861 said corporation had expended about the sum of $15,000 in purchasing lands and erecting said buildings thereon, which said lands and buildings were then of the value of $15,000. Said corporation was unable, by subscriptions to the stock thereof, and by gifts and donations thereto, to obtain sufficient funds to enable it to pay in cash the cost of said land and buildings, and the expense of maintaining said school, and had contracted debts to a large amount, some of which were secured by mortgages on the real estate of said corporation. One of said mortgages, executed to one Brown, on a portion of the land of the corporation, on which about one-half of one of said buildings was situated, had been foreclosed, and the land described therein purchased by said Brown for about $1,100; but the same had cost and was of the value of $5,000 or $6,000. Another mortgage, executed to one Rhodes, covering another portion of the lands of the corporation, on which was situated the other half of said buildings, had

been foreclosed, and the premises therein described purchased by one Coon, executor of Rhodes, at said foreclosure sale, for the sum of about $900, leaving the title in said corporation to a small portion of said lands, being a strip four rods wide, extending through the interior of said grounds, on which was situated the one-half of one of said buildings covered by the Brown mortgage. Another mortgage had been executed to the defendant *C. R. Head,* one of the corporators, a trustee and president of the board of trustees, on which was due about $2,500 or $2,600. From sixteen to twenty scholarships had been issued by said corporation, which entitled that number of pupils to attend said school without paying for tuition, thus lessening the current revenue of said school.

"Certain persons, to the number of about eleven, stockholders in said corporation, friends of said school, interested in maintaining the same, had purchased the real estate bid off by Brown at his foreclosure sale, and held title thereto avowedly for the benefit of said school. The corporation having thus fallen into financial embarrassment, and lost title to the larger portion of its real estate and school buildings, it was thought desirable by the friends of said school, and those interested in maintaining it, to reörganize the corporation, obtain enlarged powers therefor, and, if practicable, liquidate its indebtedness, and extinguish said scholarships, by changing the same into capital stock thereof. Accordingly, in the year 1862, certain friends of said school applied to the legislature for a new act of incorporation, whereupon the legislature passed an act entitled, 'An act to incorporate the Albion Academy and Normal Institute,' approved March 31, 1863. By this act, certain persons named therein were created a body corporate and politic for educational purposes, by the name last mentioned, with power to hold and convey real estate and personal property, to adopt such by-laws for the said corporation, and the business thereof, as they might deem necessary, not inconsistent with the laws of the United States or of this

state. The act also provided that said corporation should have all the powers and privileges, and be subject to the restrictions and liabilities, of chapter 78 of the Revised Statutes, entitled, 'General provisions relating to corporations,' so far as the same might be applicable and not inconsistent with the provisions of said act; that the property and affairs of the corporation should be managed by a board of fifteen trustees, a majority of whom should constitute a quorum for the transaction of business; that said trustees should be divided into three classes of five each; that the persons named as corporators in said act should be the first board of trustees, classifying them; that the first class should hold their offices for one year, the second for two years, and the third for three years; and thereafter the trustees should hold their offices for three years; and that every trustee should hold his office until his successor should be duly elected.

"Said last-mentioned act also contained the following: 'Section 4. There shall be an annual meeting held in the town of Albion in Dane county, on the last Tuesday of June in each year, to elect that class of trustees whose term of office shall then expire; such election shall be by ballot, and the persons equal to the number in that class receiving the highest number of votes shall be declared duly elected. Every person who shall have subscribed $10 for said academy, and paid fifty per cent. thereon, shall be a legal voter at such election; and any stockholder may authorize any person to cast the number of votes to which such stockholder may be entitled by the amount of his or her stock in said corporation, by a written proxy, at any such annual election.' Said last-mentioned act also provided that said board should have the power to elect a president, secretary and treasurer, from their own number, to purchase grounds, purchase, lease and erect buildings, and sell or rent the same for educational purposes, and to devise and execute all lawful measures for the management and prosperity of said institution. Nearly or quite all of the corporators

named in said last-mentioned act of the legislature were trustees of the old corporation, as it existed at the time of the passage of the last-mentioned act; and said school had continued to be maintained, and said old corporation had the continued use, free of rent or charges, of said real estate and buildings situate thereon, notwithstanding the sale of the larger portion thereof as aforesaid.

"A majority of the said corporators named in the last-mentioned act of the legislature met on the 24th day of June, 1863, for the purpose of organizing a new corporation under said last-mentioned act; and they elected a president, secretary and treasurer; elected two trustees in place of two of said corporators, one of whom had died and the other refused to act; and fully organized said corporation and entered upon their duties as trustees thereof, under and in pursuance of said act. Said board of trustees made arrangements to purchase and acquire title to all the property, real and personal, which was then owned or which had been owned and used by the corporation organized under the act of 1853, for the purpose of carrying on said school, and, as a consideration for said property, resolved to issue stock of said new corporation to the stockholders and creditors of the old corporation, to the holders of scholarships therein, and to the persons who had purchased at said foreclosure sales portions of the real estate of the old corporation as aforesaid, for the respective amounts so agreed upon; and it was also resolved by the trustees of said new corporation, at said meeting, that the executive committee of said board of trustees, which was then and there appointed, be authorized to receive subscriptions to the capital stock of said corporation in cash or such property as they might think proper, and to issue stock therefor.

"Said corporation was put into full working operation; and subsequently subscriptions to its capital stock were received to a large amount; certificates of stock in shares of $10 each were issued therefor; title to all of said property, real and

personal, which had been owned and used by the old corporation for carrying on and maintaining said school, was acquired, additional property was purchased, another large building for school purposes was erected; and ever since the organization of said new corporation as aforesaid, the persons holding certificates of stock therein have, as stockholders, continued to elect trustees thereof in pursuance of said act of March 31, 1863; and said school has been maintained and carried on down to the present time."

In the view which he took of the law of the case as hereinafter stated, the judge treated " all other facts put in issue by the pleadings" as immaterial.

As conclusions of law he held, " that the said corporation, the *Albion Academy and Normal Institute*, organized under said act of the legislature approved March 31, 1863, is a private stock corporation, and not an eleëmosynary or public corporation; that said corporation was subject to the control and management of the stockholders thereof; that the questions attempted to be raised in this action, as to who are lawful stockholders having the right to vote at the annual or other meetings of the stockholders of said corporation, are questions involving purely private rights, and not of public rights which the attorney general can maintain an action to enforce." He therefore held that the defendants were " entitled to a judgment dismissing the action, and for their costs and disbursements, to be taxed."

Judgment was rendered accordingly, from which the attorney general appealed.

For the appellant there was a brief by *Alex. Wilson*, Attorney General, with *S. U. Pinney*, of counsel, and oral argument by *Mr. Pinney:*

I. Jurisdiction in this case and the right of the attorney general to sue stand upon the general ground of the existence of public trusts. Two grounds coëxist, either of which is sufficient to sustain the suit: 1. The jurisdiction of courts of

equity over corporations at the suit of the attorney general, founded on the idea that, as the public good is the consideration for granting the franchises of the corporation, the corporation holds them upon a trust public in its nature, by which it is bound to exercise them and not to abuse or exceed them, or act adversely to public policy. See *Att'y Gen. v. Railroad Companies*, 35 Wis., 523. 2. The jurisdiction which exists upon the ground of the right of a court of equity at the suit of the attorney general to entertain suits in relation to public charities, to redress grievances and remedy or prevent mismanagement and abuse. The former ground of jurisdiction is the trust as to franchises and powers held by the corporation for the public benefit; the latter is the trust as to property held for like purposes, and which may be vested either in trustees or in a corporation. The question whether the attorney general can sue or the suit must be brought by some private party, depends upon whether the injury sought to be redressed is public in its nature, affecting public interests, or whether it is merely private, affecting private rights and interests only. In the latter case the attorney general cannot sue; in all other cases he can. In case of a wrong which is also a public as well as a private injury, the attorney general may sue in respect to the public injury, although a private person may also sue in respect to his private injury. The wrongs alleged in the information in this case are public wrongs. The corporation defendant is an eleëmosynary corporation, created for purposes entirely charitable in the estimation of the law, and so subject to the control of the courts at the instance of the attorney general. See *Dartmouth College v. Woodward*, 4 Wheat., 540–550, 668–678. Eleëmosynary corporations may be either public or private in their foundations, but they are always public in their use or purpose to be accomplished, "unless the objects of the bounty be themselves incorporated." Every charity which is extensive in its reach is in a certain sense a public charity, in contradistinction to a charity em-

bracing but a few definite objects; and in this sense a private corporation may be a public charity. Nothing is made, therefore, against the jurisdiction by showing that this corporation is a private one. It was "created a body corporate and politic for educational purposes." And while the foundation is private, the use is for a public charity. In respect of a mere private charity, the attorney general cannot sue; but it is common learning that in respect to a public charity he can sue; and as to the test in such cases, see Perry on Trusts, § 710; *Att'y Gen. v. Haberdashers' Co.*, 1 Myl. & K., 420; *Att'y Gen. v. Prop'rs of Federal St. Meeting House*, 3 Gray, 44–52. The payment of tuition or admission fees, if required, does not render the institution any the less a public charity in the estimation of a court of equity. *Gooch v. Association, etc.*, 109 Mass., 558; *McDonald v. Hospital*, 120 id., 433. The title to all the revenues and property is vested in the corporation in trust for educational purposes. The *cestui-que-trusts* are those who may choose to avail themselves of the educational advantages which the institution furnishes. All sums subscribed to the funds of the corporation were donated to it in trust. The donors have no interest, legal or equitable, and in the absence of the provision in the charter providing a board of trustees and vesting the power of the corporation in them, the donors would have been visitors, in right of being the perficient founders of the institution. The subscribers have delegated this right of visitation and control to the trustees, but by section 4 of the charter have reserved to themselves the right of choosing the trustees who are to exercise the powers of the corporation. It is therefore of the essence of the thing, of the very substance of the trust, that they have this right, and that it be not subverted or denied, and that no one be admitted to a voice or control in the choice of trustees who is not an actual *bona fide* founder or contributor. The acts complained of are violations of the charter, breaches of trust, and conduct on the part of the defendants adverse to

public policy. They go to the foundation of the charity, utterly subverting it; and the attorney general is therefore the proper party to sue. *Att'y Gen. v. Railroad Companies*, 35 Wis., 527, 550; 2 Kent's Comm., 301, 304; Potter on Corp., §§ 742, 744; *Amherst Academy v. Cowls*, 6 Pick., 433; *In re Murdock*, 7 id., 320; *Sanderson v. White*, 18 id., 328; *Allen v. McKeen*, 1 Sumn., 296; *People v. College*, 38 Cal., 166; *Bryant v. College*, 1 Cin. S. C., 307. II. The entire interest, legal and equitable, of the property invested in the corporation, is under the control of fraudulent trustees; and the trusts created by the subscriptions are for a charitable purpose, public in its nature, so that the *cestue-que-trusts* are an indefinite and indeterminate class, who cannot come into court and sue to redress these wrongs; and therefore the attorney general, as representing the public, may and must sue. His right to sue by information in equity in respect to such matters is well established. 2 Story's Eq. Jur., § 1191; Mitford's Eq. Pl., 196–7; Story's Eq. Pl., §§ 7–9; *Jackson v. Phillips*, 14 Allen, 539, 579; *Att'y Gen. v. Utica Ins. Co.*, 2 Johns. Ch., 389; *Att'y Gen. v. Governors, etc.*, 3 Myl. & K., 544; *Parker v. May*, 5 Cush., 336; *Att'y Gen. v. Detroit*, 26 Mich., 263; *Sanderson v. White*, 18 Pick., 339; *Going v. Emery*, 16 id., 119; *People v. Miner*, 2 Lans., 396; *Chambers v. Baptist Society*, 1 B. Mon., 219; *McDonald v. Hospital*, 120 Mass., 435; *Att'y Gen. v. Garrison*, 101 id., 223; *Att'y Gen. v. Dublin*, 38 N. H., 459; *Att'y Gen. v. Proprietors*, 3 Gray, 1, 47–52; *Att'y Gen. v. Tudor Ice Co.*, 104 Mass., 239, 244. In the last two cases the distinction between charities public in their nature and mere private interests or private charities, is clearly elucidated.

For the respondents there was a brief by *Sloan, Stevens & Morris*, and oral argument by *Mr. Sloan:*

There is no ground for claiming that the respondent is not strictly and purely a private corporation. The law seems to be well settled and elementary. Ang. & Ames on Corp.,

§ 34; *Dartmouth College v. Woodward*, 4 Wheat., 668–9, 697–700; *Case of St. Mary's Church*, 7 S. & R., 559; *Bailey v. New York*, 3 Hill, 531; *Philips v. Bury*, 2 Term, 352; 2 Kent's Comm. (11th ed.), 319 (275). And the question has been fully settled by this court. *Trustees v. Hoessli*, 13 Wis., 348; *Curtis v. Whipple*, 24 id., 350. The fact that the charter contemplated that the corporation might receive gifts and donations to aid it in accomplishing the purpose for which it was created, does not in any way tend to change its character from a private to a public corporation. *Society, etc., v. New Haven*, 8 Wheat., 464, 480; *Trustees of Vincennes University v. Indiana*, 14 How., 268. It is the theory that all corporations are created for the public benefit; they exercise franchises granted by the legislature to promote public interests; but this incidental public benefit which is really or presumptively derived from corporations, does not give the attorney general the right to superintend the internal management of their affairs. There is no question here of the defendant corporation exceeding its corporate powers, nor of diverting public funds held in trust as a public charity. The contention is wholly as to who has a right to vote at its annual meeting of stockholders in the election of officers, and thus obtain control of the corporation. In this contention the public are not interested, and the attorney general has no right to interfere. *Att'y Gen. v. Meeting House*, 3 Gray, 50–52; *Att'y Gen. v. Railway Co.*, 1 Drew. & Sm., 161.

LYON, J. The controlling question to be determined on this appeal is, Can the attorney general maintain the action? The rule by which it must be determined is tersely and accurately stated by the learned counsel for the relator, as follows: "The question whether the attorney general *can* sue, or whether the suit *must* be brought by some private party, depends upon whether the injury sought to be redressed is *public* in its nature, affecting *public* interests, or whether it is merely

*private*, affecting *private rights and interests only*. In the latter case the attorney general cannot sue; in all others he can. In case of a wrong which is also a *public* as well as a *private* injury, the attorney general may sue in respect to the *public* injury, although a private person may also sue in respect to his *private* injury." This is the doctrine of *Att'y Gen. v. The Railway Cos.*, 35 Wis., 425, and of nearly or quite all of the numerous authorities on the subject, both English and American, there cited. Pages 523–534.

The defendant the *Albion Academy and Normal Institute* is a private corporation. The fourth section of its charter, copied in the findings of the court, is somewhat ambiguous; but it is sufficiently apparent that the legislature intended that its property and franchises should be owned and controlled by the subscribers to its funds, through a board of trustees to be elected by them. The most convenient and equitable way in which this could be done, was to capitalize the subscriptions and divide the stock into shares, each representing a specified sum, giving to the holder of each share one vote in all corporate meetings of the subscribers or stockholders, and in the election of trustees. Section 4 clearly recognizes the subscribers to the fund as the stockholders of the corporation, and that some of them may be entitled to a plurality of votes in corporate meetings of stockholders. Without referring to the charter of the Albion Academy and Teachers' Seminary, ch. 195, P. & L. Laws of 1853 (which was the predecessor of the present corporation, and was, unmistakably, a stock corporation), to explain the ambiguity in section 4 of the charter of the defendant corporation, we have no difficulty in holding that the latter is a private stock corporation, and that the subscribers to its funds are the stockholders. But it is argued that, although such is the nature of the corporation, still its franchises are public, and an abuse of them a public wrong, to correct which the attorney general may intervene. We find in the charter two restrictions upon the corporation. These

are: (1) " No religious tenets or opinions shall be requisite as a qualification for the office of a trustee, nor shall any religious tenet be required of students to entitle them to all the privileges of the institution, and no sectarianism shall be taught or tolerated in said institution, or any department thereof." Section 5. (2) " Persons of both sexes shall be admitted to all the advantages of the institution." Section 6.

Subject to these restrictions (no violation of either of which is alleged), the corporation may admit as students or reject whoëver it chooses, and may fix any reasonable rate of charges for tuition. No one can claim the *right* to receive instruction in the institution on any terms, and no provision is made for gratuitous instruction. It is a private enterprise, and if it yields a profit, undoubtedly the stockholders may divide it equitably among themselves; or they may wind up its affairs and divide the corporate property or its proceeds between them, after paying the debts of the corporation. · Such a corporation is not a charity. It lacks many, if not all, the essential elements of a public eleëmosynary corporation. True, it is a corporation for educational purposes, and the public has an interest in the dissemination of knowledge. The same may be said of a corporation which maintains a church, or gymnasium, or library, or lyceum, or which publishes books or newspapers; for the religious, intellectual, moral and physical education of the people are, in the same sense, of public interest. Yet the purposes for which such corporations are created are not public in that sense which necessarily authorizes the attorney general to intervene in behalf of the public or the state to correct abuses of their franchises. Unless a public wrong is being committed, or some fundamental principle of public policy violated, the only remedy is by private action instituted by the party or parties aggrieved.

In this case we find no such wrong or violation complained of, and we think the circuit court properly dismissed the complaint. We have considered the case on principles of general

law, because it was mainly argued from that standpoint; but we have a statute which is, in some sense, a codification of the general law concerning visitorial powers over corporations. Under that statute the attorney general may maintain actions in a great variety of cases to correct abuses of corporate franchises and to annul charters (R. S., 833, secs. 3237, 3239); but it is expressly declared that these provisions "shall not extend to any incorporated library or lyceum society, to any religious corporation, or any incorporated academy or select school, nor to the proprietors of any burying-ground incorporated under the laws of this state." Section 3251. That the *Albion Academy and Normal Institute* is "an incorporated academy or select school," within the meaning of the statute, we cannot doubt. So, whether we consider the case in the light of general rules of law, or of the statute, we reach the same conclusion, which is that the attorney general cannot maintain the action.

*By the Court.* — The judgment of the circuit court is affirmed.